Nov. Term, 1856.

THE MADISON AND INDIANAPOLIS RAILROAD COMPANY *v.* WHITENECK.

THE MADISON AND INDIAN- APOLIS RAIL- ROAD CO. v. WHITENECK.

| 8 | 217 |
| 133 | 151 |

| 8 | 217 |
| 145 | 593 |
| 147 | 198 |

| 8 | 217 |
| 150 | 101 |

If a party voluntarily abstain from claiming the right of trial by jury in a given case, it may be judicially held that is waived.

Hence the statute (2 R. S. 115) enacting that such act shall be regarded as a waiver, is valid.

The whole of the act of 1853 entitled, "An act to provide compensation to the owners of animals killed or injured by the cars, locomotives or other carriages of any railroad company in this State," is not void for inconsistency with its title. The immediate purpose of the act is expressed in the title; and the exception as to railroads that are fenced, is so properly connected with the subject-matter of the act designated in the title, as rightly to appear in it under the title.

Nor is the act void simply because it is special.

The third section of the act is unconstitutional and void, so far as it inflicts a penalty for appealing and failing to reduce the judgment 20 per cent.

The first section of the act is also void so far as it gives, as to amount, unlimited jurisdiction to justices of the peace.

The legislature did not transcend its powers, or violate private right, in enacting that railroad companies shall fence their roads, or pay for the cattle they kill or injure.

APPEAL from the *Johnson* Court of Common Pleas.

*Monday, December 1.*

PERKINS, J.—Suit commenced before a justice of the peace to recover the value of a heifer killed by a locomotive on the *Madison* and *Indianapolis* Railroad. Recovery before the justice, and appeal to the Common Pleas. In that Court, the defendant not appearing, judgment was rendered for plaintiff without the intervention of a jury, for double the amount of the judgment before the justice, &c.

A point is made which may be briefly disposed of before entering upon the main questions in the cause.

It is said a jury should have been called to assess the

NOTE.—The subject of legislative power is discussed at great length, and with much learning, in the opinion of Judge PERKINS; but as the majority of the Court agree in nothing but the conclusions reached by the judge's course of reasoning, nothing more is embraced in the syllabus and index.

Nov. Term,
1856.

THE MADISON
A ND INDIAN
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

damages, notwithstanding the failure of the defendant to appear, as the case stood upon the general issue.

The constitution of our State does not say that trials shall be by jury. It says, "The right of trial by jury shall remain," &c. If a party voluntarily abstains from claiming the right in a given case, we think it may be judicially held that it is waived. Hence, the statute enacting that such act shall be regarded as a waiver, is valid. 2 R. S. p. 115.

The suit was instituted under the act of *March* 1, 1853 (Laws of 1853, p. 113), relative to compensation for animals killed or injured by railroad machinery; and as the act is short and gives rise to several somewhat weighty questions now to be considered, we insert it, except the repealing section, in this opinion. It follows:

An act to provide compensation to the owners of animals killed or injured by the cars, locomotives, or other carriages of any railroad company in this State. Approved *March* 1, 1853.

SECTION. 1. *Be it enacted by the General Assembly of the State of Indiana*, That whenever any animal or animals shall be killed or injured by the cars, or locomotives, or other carriages used on any railroad in this State, the owner thereof may go before some justice of the peace of the county in which such injury occurred, and file his complaint in writing, and such justice shall fix a day to hear said complaint, and shall cause at least ten days notice to be served on the railroad company defendant, by service of summons by copy on any conductor of any train passing through said county.

SEC. 2. On the hearing of said cause, the justice or jury trying the same shall give judgment for the plaintiff for the value of the animal destroyed or injury inflicted without regard to the question whether such injury or destruction was the result of willful misconduct or negligence, or the result of unavoidable accident.

SEC. 3. If the defendant shall appeal from such judg-

ment, and shall not reduce the damages assessed twenty per cent., the appellate court shall give judgment for double the amount of damages assessed in such appellate court, and a docket fee of 5 dollars.

Sec. 4. This act shall not apply to any railroad securely fenced in, and such fence properly maintained by such company.

It is contended that this act is unconstitutional—

1. Because the object of it is not indicated in its title. It is claimed to be, in fact, an act to compel railroads to fence in their tracks, and to inflict penalties on the exercise of the right of appeal.

2. Because it is a special act. And,

3. Because it violates private right.

It is further insisted that its third section is unconstitutional because it impairs the right of appeal.

1. We do not think the whole act void for inconsistency with its title. Its immediate purpose is there expressed. The act contains an exception as to railroads that are fenced; but we think the exception so properly connected with the subject-matter of the act designated in the title, as rightly to appear in it under that title.

2. We do not think the act void simply because it is special. There is no provision of the constitution prohibiting, in terms, special legislation on the subject of railroads; and, from the peculiar character of the subject, we cannot say such legislation may not be proper. Special subjects may require some special legislation; and when it takes place it will be for the Court to judge, as in the *Clay* county case and the *Lafayette* murder cases, under section 23, of article 4, of the constitution, whether more general legislation could reasonably have been made applicable (5 Ind. R. 4, and 7 Ind. R. 326); and, also, whether such special legislation conflicts with any other constitutional provision.

3. The act is alleged to infringe private rights and principles of natural justice, because it makes requirements of railroad companies beyond those contained in the laws under which they organized, and unwarrant-

Nov. Term, 1856.

The Madison and Indianapolis Railroad Co. v. Whiteneck.

ably interferes with the prosecution of business pursuits; and it is insisted that the legislature cannot thus act for want of authority.

This objection brings up, to some extent, the general question of the power of the legislature over the various pursuits of the people of the State—in other words, of legislative power; and we propose to avail ourself of the occasion to express somewhat at length our views upon it. What, then, is the legislative power of this State? The answer to this question must be drawn from an examination of the constitution. Turning to it we find article 3 to provide that the powers of government shall be divided between three departments, and section 1, of article 4, to declare that, "The legislative authority of the State shall be vested in the General Assembly."

But so far, these sections, it will be observed, do not define that legislative authority; they simply ordain a division of powers and designate the department in which the legislative, whatever it may be, shall be lodged. The distribution of the powers of government, as a distinctive feature in their creation, among different departments, is a comparatively modern idea, suggested by the accidental development in that form, to a great extent, of the *British* government; and probably first formally enunciated to the world as an invaluable precept in the science of politics, by the celebrated *Montesquieu*, of *Bordeaux*, in *France*, in his Spirit of Laws, published about the middle of the 18th century. Such division, therefore, does not necessarily follow upon the simple organization of a government. Hence it became imperative, in order to insure a distribution of powers in the government of this State, to provide for it in the organization. See Madison in No. 47 of the Federalist.

The legislative power, then, being as yet simply located, the inquiry still occurs, what—how great is that power? Is it unlimited? This question has been much discussed of late, in several cases, and deserves most careful consideration in its final determination. It has

been asserted by some that, "the legitimacy of all laws originates, not in the will of him or them who make the laws, whoever they may be, but in the conformity of the laws themselves to truth, reason, and justice, which constitute the true law." Guizot on Rep. Gov. pp. 204, 217. And if we add the further proposition of some religious, moral, and political philosophers, that it is the right of every man to judge of this conformity to justice of each law, and to obey or disobey it accordingly, we have complete what is called in this day, the "higher law" doctrine; a doctrine consistent with the individual independence of man, but utterly inconsistent with, and impracticable in, orderly government.

In such a government, the legitimacy of laws must rest in the will of the law-making power. It must be so, or government is nothing. Still, there are subjects and matters in relation to which no government should assume to control the will or action of any individual. This we shall make appear in the course of this opinion. Hence, the law-making power should be limited. Yet, from its very nature, it would seem that, practically, limits could scarcely be set to its exercise except by written constitutions; nor by these, without the existence of a power to annul laws enacted outside of the limits established; and, historically considered, we do not find that it had been thus limited prior to the formation of the *American* States. True, *Great Britain* had, before that time, her magna charta and petition of right, but they were not ordained by the people in their sovereign capacity, and were not, in fact, paramount to acts of Parliament, however much deference might, under ordinary circumstances, be paid to them. Parliament remained in reality, omnipotent. No power tested its enactments by a constitution.

Nor would the legislative power necessarily be limited by a written constitution. That might simply provide for a government, without any restriction upon its power; or it might expressly confer unlimited power.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

In either of these cases its power would doubtless be absolute, if not morally, at least, practically.

But a constitution might limit the legislative power. It might do this either by specifying the cases in which alone the power should be exerted, or it might confer the power generally, subject to certain limitations, in which event the power would remain indefinite, unlimited wherever limitations did not operate. This latter is the case of the constitution of *Indiana*. Our legislature is 'not by abstract moral right, but in actual fact, absolute, where not restrained by that instrument. *Doe* v. *Douglass*, 8 Blackf. 10.

The legislative power in this State, where the constitution imposes no limits, must be practically absolute, whether it operate according to natural justice, or not, in any particular case; for when a law is created by the legislature the executive must enforce it, and is vested with control of the military power of the State to enable him to do it; and, aside from the physical power of the united people of the State, there is no power to arrest the execution except the judiciary, and that department can only do it when the law conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power. *Herman* v. *The State*, 4 Am. L. Reg. 344.—*Beebe* v. *The State*, 6 Ind. R. 501.

The great point of difficulty here, therefore, must ever arise in determining the meaning—the extent of operation of the declaratory and expressly restrictive provisions of the organic law—the reservations in the bill of rights—in short, the implications of the constitution. Such it was in the case of *Beebe*, *supra*. May the judiciary pronounce a law void because of repugnance to the fundamental principles of the government declared in the constitution as being prohibited by implication, though not in express words? Or because of repugnance to the clear scope and intention, the spirit, of express restrictions, as being impliedly embraced by

them? These are now the questions. For example,
the first section of the article of the bill of rights,
declares that all men are endowed with unalienable
rights, among which are life, liberty, &c. Now, how
broad a meaning is to be given to this section? With
what view or object was it inserted in the constitution?
What should be its interpretation? We shall enter
upon no discussion of man's power of alienation, and
no criticism of the word "unalienable." See Lieber
vol. 1, p. 218. We shall not insist upon the philolo-
gical accuracy of its use. We shall not dispute but that
"primordial" or "imprescriptible" or "unalienated" might
have been better used. We shall only endeavor to as-
certain the meaning with which the term "unalienable"
was used. And if, to express that certain rights had
not been alienated, and ought not to be, a term was
used which meant that they could not be, it does not
weaken the force or clearness of intention in the ex-
pression.

We proceed, then, to the work of interpretation. In
*Prigg* v. *Pennsylvania*, 16. Pet. on page 610, it is said
that, "perhaps the safest rule of interpretation [of the
constitution] after all will be found to be, to look to the
nature and object of the particular powers, duties, and
rights, with all the light and aids of contemporary his-
tory, and to give to the words of each just such opera-
tion and force, consistent with their legitimate meaning,
as will fairly secure and obtain the end proposed." To
the same effect, *Martin* v. *Hunter*, 3 Cond. Rep. on p.
557; 1 Kent, 448; Federalist, No. 78; Smith on Statutes
p. 418, s. 276. Guided by this rule, let us proceed to
seek the true interpretation of the first section of the
bill of rights above quoted. We examine it in the
light of contemporary history.

The monarchies of *Europe* were formerly, if they are
not now, administered upon the principle that the peo-
ple were utterly destitute of all rights, and entirely at
the mercy of government. In the 17th century, the

Nov. Term, 1856.

THE MADISON AND INDIAN-APOLIS RAIL-ROAD CO.
v.
WHITENECK.

principle was not only thus acted upon, but it was maintained in formal treatises as being in accordance with the will of God. The tyranny exercised upon the people, under this doctrine, roused attention, excited inquiry as to, and led to the denial of, its soundness. Men with minds liberalized, enlightened, and invigorated by the perusal of recovered ancient learning, and hearts warmed by the eloquence of ancient freedom, entered upon the study of the science of the rights of man, and arrived at the conclusion that he was possessed of such by nature, which it was tyranny in government to invade. Such statesmen and scholars as *Buchanan*, *Harrington*, *Milton*, *Sidney*, *Fletcher*, *Vane*, and others, perhaps their equals, among whom it is not improper to include the illustrious and excellent *William Penn*, ably answered the writings of *Filmer*, and other advocates of despotic power. The controversy waxed warm and spread widely. It enlisted the nation. It came with the colonists to *America*, and was prolonged. *Great Britain* practiced upon her maxims of absolutism in governing here, disregarding the rights of person and property. The people denied the justice of her administration and made a question upon their natural rights. Histories of the Revolution, *passim*. The discussion of the question extended to *France*, and there, as it had done in *England* and in *America*, produced a revolution. The *French* convention, pursuant to suggestion of *Lafayette*, (Mod. Europe, vol. 3, p. 186; Mack's, Life of *Lafayette*, p. 219,) declared: "The end of all political associations is the preservation of the natural and imprescriptible rights of man; and these rights are liberty, property, security, and resistance of oppression." Paine's Pol. Works, vol. 2, p. 112. And, *per Lafayette*, in that convention: "Every man is born with rights inalienable and imprescriptible; such are the liberty of his opinions; the care of his honor and his life; the right of property; the uncontrollable disposal of his person, his industry and all his

faculties; the communication of all his thoughts by all possible means; the pursuit of happiness and the resistance of oppression.

"The exercise of natural rights has no limits, but such as will ensure their enjoyment to other members of society." Mack. *supra.* This declaration, *Burke,* who, alarmed at innovation, had abandoned liberal principles, undertook, in his "Reflections," &c., to refute; and, as to the *British* nation, contended that if its people ever had any rights they had formally alienated them—made "as solemn a renunciation of them as could be made," by a declaration to King *William,* on his accession to the throne, that, "the lords spiritual and temporal and commons, do, in the name of all the people aforesaid, most humbly and faithfully submit themselves, their heirs, and posterities for ever," &c. Burke's Works, Dearb. Lib. ed., vol. 1, p. 463.

These "Reflections" of *Burke* drew forth replies—among them, *Paine's* "Rights of Man," and Sir *James Mackintosh's* powerful "Defense of the French Revolution," in which he vindicates the declaration of man's natural rights, and proves the unsoundness of *Burke's* doctrine. "This doctrine," says he, "thus false in its principles, absurd in its conclusions, and contradicted by the avowed sense of mankind, is, lastly, even abandoned by Mr. *Burke* himself. He is betrayed into a confession directly repugnant to his general principle, viz.: 'Whatever each man can do without trespassing on others, he has a right to do for himself,'" &c.

Again: "The existence and perfection of these rights being proved, the first duty of law-givers and magistrates is to assert and protect them. The moment that the slightest infraction, of these rights is permitted, through motives of convenience, the bulwark of all upright politics is lost. If a small convenience will justify a little infraction, a greater will expiate a bolder violation; the *Rubicon* is past." Mackintosh's Miscel. Works, pp. 590, 591, 592. Pending this great discussion the people of the *United States* came to a decision

VOL. VIII.—15.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

upon the question in controversy, and thus declared it: "We hold these truths to be self-evident—that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness; that to secure these rights governments are instituted among men," &c. Dec. of Independence. This declaration was framed and adopted by men of no mean judgment, and who understood and weighed the language used. The States severally, most of them, proceeded to ordain constitutions of government in which they said, for example, as in that of *Pennsylvania:*

"That the general, great, and essential principles of liberty and free government may be recognized and unalterably established, we declare:

"That all men are born equally free and independent, and have certain independent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property and reputation, and of pursuing happiness."

And they declared that everything in the bill of rights was excepted out of the general powers of government, and to forever remain inviolate.

In the constitution of *Delaware* thus:

"Through divine goodness, all men have by nature the right of worshipping and serving their Creator according to the dictates of their consciences, of enjoying and defending life and liberty, of acquiring and protecting reputation and property, and, in general, of attaining objects suitable to their condition, without injury one to another; and as these rights are essential to their welfare, for the due exercise thereof, power is inherent in them," &c. Accord. *Kentucky, Ohio, Indiana,* in 1816, Connecticut in 1818, till which time she had lived under her colonial charter, and *Rhode Island,* who had thus lived till 1843, when she, also formed a constitution. Placing ourselves thus amid the circumstances in which the framers of our early State constitutions stood at their formation, and from thence interpreting

them, and ours as a substantial copy, what force should be conceded to the first section of the bill of rights which we have quoted? The purpose for which it was intended appears to be plain enough, and also the great importance attached to it. The monarchies of *Europe* maintained the doctrine that the people had no natural rights, and, hence, might rightfully be controlled at will and without limit by the government. The people in this country denied the doctrine and determined to emancipate themselves from it.

The governments of *Europe* practiced upon their principles and disregarded all rights in the people in administration. They regulated everything by law, even, on occasions, "the subsistence of the people." "The hand of authority was seen in everything, and in every place." They were actuated by "a restless desire of governing too much." Burke, *supra.* vol. 2, p. 192. And see Stevens's Lectures on France, p. 17.

These abuses, and oppressions, the people of this country determined to prohibit here; they determined to be, in the language of some of the constitutions, secure from their exercise upon themselves or their posterity. That security they designed should be perpetuated by their constitutions, and particularly by the clause in question.

In the great discussion of which we have spoken above, a proposition had been submitted,—for the first time in the history of the world, thinks Mr. *Sparks,* by Sir *Henry Vane,*—that "restraint be laid upon the supreme power as a fundamental constitution," that it might be "bound up" so that "this great blessing [of freedom of conscience] will hereby be so well provided for, that we shall have no cause to fear." Sparks's Am. Biography, vol. 4, pp. 262, 263.

Such was the object and intention of the framers of our constitution, in regard to natural rights. They designed the first section of it as a fundamental provision, binding up the supreme power. It was necessarily general. They could not look down the stream of time

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

and see all the cases wherein it would be proper for a state government to exert legislative power, specify them and exclude all others, thus protecting the rights reserved; nor could they anticipate all the various attempts that might be made to invade these rights, and expressly prohibit them. They did specially prohibit such as they had experienced. But naming such attempts did not exclude the prohibition of others by the general fundamental provision. *The State* v. *Barbee*, 3 Ind. R. 258.— *Thomas* v. *The Board*, &c., 5 Ind. R. 4. Further, we may say that these restraints were intended to operate upon the legislative power, though we suppose that this will not be denied. Parliament had most severely outraged the rights of *America*. The colonists "knew it to be their most dangerous enemy." Bancroft's Hist. U. S. vol. 6, p. 138. It had enacted laws prohibiting certain pursuits in *America*. Botta's Hist. vol. 1, pp. 25, 26. The judges of *England*, in answer to a question by *Cromwell*, Earl of *Essex*, had reluctantly said, that if Parliament should condemn a man to die without a hearing, it would be valid. Hallam's Const. Hist. p. 28. Mr. *Jefferson* urges as an objection to the constitution of the *U. S.* the want of a bill of rights.

In a letter to Col. *Humphreys*, in 1789, he says:

"I am one of those who think it a defect, that the important rights, not placed in security by the frame of the constitution itself, were not explicitly secured by a supplementary declaration. There are rights which it is useless to surrender to the government, and which the governments have yet always been found to invade. These are the rights of thinking, and publishing our thoughts by speaking or writing; the right of free commerce; the right of personal freedom.

"We are now allowed to say, such a declaration of rights, as a supplement to the constitution where that is silent, is wanting, to secure us in these points. The general voice has legitimated this objection." Jefferson's Works, vol. 3, p. 13. The states in their several constitutions, obviated, as to them, the objection. Such

a declaration, Mr. *Jefferson* admitted, would place a
check in the hands of the judiciary.    Tuck. Life of
Jefferson, vol. 1, p. 281.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

Having thus ascertained the intention of the section
in question, it is the duty of the Court, so far as con-
sistent with its language, to give effect to it accordingly.
The mere demarkation on parchment of the constitu-
tional limits, is not a sufficient guard against the en-
croachments of tyrannical legislation.    The early his-
tory of *Virginia* and *Pennsylvania* establishes this.    In
this latter State, in 1783 and 1784, a council of cen-
sors assembled, charged with the duty of inquiring
"whether the constitution had been preserved invio-
late;" and they reported that it "had been flagrantly
violated by the legislature in a variety of important in-
stances."  Madison in Federalist No. 48.   "Liberties
are nothing until they have become rights—positive
rights formally recognized and consecrated.   Rights,
even when recognized, are nothing, so long as they are
not entrenched within guarantees.   And lastly, guaran-
tees are nothing, so long as they are not maintained by
forces independent of them, in the limit of their rights.
Convert liberties into rights, surround rights by guar-
antees, entrust the keeping of these guarantees to forces
capable of maintaining them—such are the successive
steps in the progress towards a free government."
Guizot on Rep. Gov. p. 302.

"The courts of justice are to be considered the bul-
warks of a limited constitution."   Federalist No. 68.
"The courts were designed to be an intermediate body
between the people and the legislature, in order, among
other things, to keep the latter within the limits as-
signed to their authority."  *Id.* and Lieber, vol. 2, pp.
280, 281, 282.

We come to the conclusion, then, that the courts
should declare void a law in violation of this funda-
mental principle of the constitution—a law in violation
of the natural rights of man.   To be explicit: the
courts cannot annul an act of the legislature simply be-

cause it violates the fundamental principles of correct legislation; but because it violates a fundamental principle of the constitution. Lieber, vol. 2, p. 602.—6 Ind. R. 87, 88, 96.—1 Kent, 450, note.—*Martin ex parte*, 8 Eng. (Ark.) 198. The act annulled according to the expression always used touching the subject, must be unconstitutional.

It has been said, indeed, by high authority that, "there are certain absolute rights, and the right of property among them, which, in all free governments, must of necessity be protected from legislative interference, irrespective of constitutional checks and guards." 7 Blackf. 477. And the dictum is supported by eminent jurists and writers of celebrity. American Law Magazine, vol. 1, p. 319, (1843), and the cases there cited. Junius, vol. 1, p. 88, in dedication.

But this doctrine would not be admitted in the *English* courts where there is no written constitution, and cannot arise here, because, as we have seen, our constitution does protect these natural rights.

Again, it is sometimes said the courts may pronounce an act void because not properly within the scope of legislative power; but this is also by virtue of the constitution, for that instrument expressly declares that the powers of government shall be divided between three departments, the legislative being one, and it expressly inhibits either from acting out of its assigned sphere (article 3); hence, the constitution, in fact, prohibits the passage of any act by the legislature, not properly within the scope of legislation.

We here take leave of this topic, remarking that as our system of polity was framed by politicians,—using the word as a synonym of statesmen, not of politicasters, —we have necessarily been led, in construing it, to study and cite the opinions of that class during the period of its formation. The review has considerably extended this opinion; and the propriety of the course is justified in the language of a section of the first constitution of *Ohio*,—article 8, s. 18,—"That a frequent recurrence to

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

the fundamental principles of civil government is absolutely necessary to preserve the blessings of liberty."

And *per Mackintosh, supra:* "Perhaps the only expedient that can be devised by human wisdom to keep alive public vigilance against the usurpation of partial interests, is that of perpetually presenting the general right and the general interest to the public eye."

If it be said that the principles asserted will sometimes thwart the will of a majority, we answer, it is admitted; but what then? Ours is not, as were, to some extent, the ancient republics, a government directly of masses and majorities, but is—

1. A government by representatives.

2. With limited powers.

3. With those powers divided among departments.

4. With one department having the ultimate right to decide upon the respective powers of all, and to annul action beyond the limits of those powers. It is, in short, a government within a constitution. The majority here cannot do everything, much less a plurality, which elects our legislature. The majority rules when all act within the limits of the constitution. If a majority or plurality may do what it pleases, and this is to be the rule without limitation, the constitution should be at once abrogated, and leave us a legislature as omnipotent as the *British* Parliament. Till this is done, we must uphold the restraints of the constitution, wisely imposed by the people themselves, upon the action of majorities and the usurpations of the legislature. Minorities, here, have some rights as against majorities, and all have some security against legislative tyranny. In the restraints of the constitution lie the liberties of the people. If it be said we thus deprive the legislature, to some extent, of power to do good, we admit it; but we also deprive it of power to do evil. Unlimited power in mortal hands is always abused. We only attempt to confine that of the legislature within the limits the people, by their fundamental law, assigned to it—limits fixed after probabilities of good and of evil had been

Nov. Term,
1856.

The Madison
and Indian-
apolis Rail-
road Co.
v.
Whiteneck.

weighed and balanced; and if those limits are unsatisfactory, the fault is of the constitution, not of us. It should ever be remembered that ours is a government that seeks to reconcile public order with private right and individual liberty. And if it is found that this cannot be done to perfection, it is to be considered in reference to the ordaining of a new constitution, whether any, and if so, how much of individual excess is to be tolerated as a lesser evil than the subjection of the people to despotic power. See Lieber on Liberty and Self Government, *passim*. "Tyranny and mere tranquillity," says *Lieber*, in his Political Ethics, vol. 2, pp. 4, 6, "are things for which men may be trained—into which they may be forced. There are no more quiet and peaceable people on earth than the *Chinese*. They have a saying, 'Better a dog in peace than a man in anarchy,'" "Rather, however," says *Lieber*, "all the disturbance of the West, so that it be a fermentation which promises a better, purer state, than *Chinese* peace and stagnation." See, on this point, *Herman* v. *The State*, 4 Am. L. Reg. 344.

The natural rights of which we have spoken, let it be observed, are not rights of vagrancy; but they inhere in man as a necessity of his nature; they belong to him because he is a man, and because he would not exist as such without their exercise. Life was the gift of his Creator; but life is not in man self-sustaining. It must be prolonged by nourishment and protection of the body. Hence, man must have food and clothing. The demand of nature is absolute. God has given him the earth and the abundance thereof whereby to supply this necessity; and limbs, and intellect, and ingenuity, by the use of which food, raiment, property, may be obtained upon and out of this earth, and in no other manner. These are the gifts and the necessities of nature, and belong to man as man. God has also made men moral beings, accountable directly to Him in respect to their mutual relations. Hence, no human authority can step between this accountability and man's Maker and final

Nov. Term, 1856.

THE MADISON AND INDIAN-APOLIS RAIL-ROAD Co. v. WHITENECK.

Judge; and, hence, man's natural, necessary right—duty even, to worship his Maker in such a manner as he will be willing to be accountable for. The race of man is perpetuated by a communion of the sexes, and parental care of offspring. The sexes are about equal in number. Every man, therefore, has the natural right to one wife and no more—monogamy is the law of nature. We thus discover that the idea of unlimited sovereignty in one man, or any number of men, over another, is unjust, unreasonable, violative of his moral nature, unwarrantable tyranny. In this manner are man's natural rights ascertained, defined, limited, rendered as certain as any other facts. As to some of them most publicists are now agreed. Others are to be determined. As enumerated by *Lieber*, in his work on Political Ethics, these rights are, substantially, 1. Life; 2. Personal liberty; 3. Free agency; 4. Resistance to oppression; 5. Trial by law before condemnation; 6. Right of utterance, communion, speaking and writing; 7. Reputation; 8. Security of person, family, &c.; 9. Freedom of conscience, worship, &c.; 10. Property, including commerce. Traffic, he insists, is a necessary right, exercised, according to history, from the origin of society, growing indispensably out of the necessary division of labor. Exchange is one of the most lawful, necessary and natural means of acquisition, founded in the variety of soil, clime, genius of people, agents of nature, &c., and one of the first and most effective means of civilization. Exchange lies in the great order of things, (see, also, Tucker's Life of Jefferson, vol. 1, pp. 58, 59,) and would alone warrant another primordial right, viz., 11. That of locomotion, going where one desires. Vol. 1, p. 192, *et seq.* of *Lieber*.

But notwithstanding the legislature cannot prohibit, it may regulate, the exercise of natural rights, and all pursuits and practices of its citizens. We do not propose to elaborate this branch of the subject at length, but lay down the following propositions as expressing the result of our reflections upon it.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

1. No man has a right to pursue a business or practice *malum in se*—entirely evil in itself. Example: The manufacture and sale of counterfeiting apparatus and counterfeit money. These articles are not and cannot be supplied to the public to meet any want, or for any useful purpose. They are made with the sole intent of cheating and defrauding. So the practices of gaming, drawing lotteries, &c., are no reasonable modes of exchange on equivalent considerations, but tricks to cheat the unwary.

2. The legislature may prohibit such pursuits and practices.

3. Every man has a right to pursue any and every business or practice not evil in itself, which the wants, appetites, fashions, and follies even, of community invite to. *Lieber*, vol. 1, pp. 159, 160. And,

4. The legislature cannot absolutely prohibit such pursuit. This must be admitted, or it must be admitted that all pursuits are at the sufferance of the legislature— the doctrine in *England*, where there is no constitution, and of a late case in *Delaware*, (*The State* v. *Allmond*), which ignores the bill of rights and constitution of that State, following, as it does, to the fullest extent, *Blackstone's* idea of liberty under the *British* government. Am. L. Reg. vol. 4, p. 533. But,

5. No man in the prosecution of his lawful business or practice has a right intentionally or carelessly to annoy or injure another. And, hence,

6. The legislature has a right to establish reasonable regulations in relation to such business or practice calculated to prevent the occurrence of such injury. The exercise of this right is analagous to requiring security for good behavior, or keeping the peace.

These regulations may relate—

1. To time. Examples: Preventing railroad trains coming from any infected point, entering any other inhabited place; preventing the running of trains on *Sunday*, &c.; suspending the exercise of any and every

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
A.
WHITENECK.

right during temporary emergencies in war and rebellion, as in the case of the writ of *habeas corpus.*

2. To place. Examples: Auction sales under the windows of a church in time of service. Sales of liquor near the ground of a camp-meeting. Offensive trades, such as slaughtering establishments, &c., in cities, &c.; and storing and building of combustible materials where they would endanger the security of life and property of others, without fault on their part.

We say without fault on their part, for it is a well settled principle of common and maritime law that a person cannot complain of an injury that his own fault inflicts. And with a poor grace would it be asked that the running of locomotives and cars should be entirely prohibited because some persons might be foolish enough to place themselves upon the road track and be run over; or that the use of ropes should be prohibited because hypochondriacs and those disappointed in business or love, might occasionally hang themselves by them.

3. To manner, occasion, &c. Examples: Rapid driving through the streets of a crowded city. Sales or gifts, knowingly made, of dangerous articles to lunatics, drunken men, idiots, minors, &c., being persons incompetent to properly use them, and likely to use them to others' injury.

Says *Lieber*, Pol. Eth. vol. 1, p. 200:

"It is not said that utterance, though necessary for me in my character of man, may not be regulated or suspended. Though I have, as man, the indisputable right of utterance, I have not the right to use it everywhere and on all occasions. So does my right of locomotion not entitle me to go where I choose, into my neighbor's field, closet, &c. I am not allowed to speak loud in a church, or in a deliberative assembly."

Usury laws are another instance of regulation. "But all these are exceptions, as by way of exception, the police may examine my rooms, whether I ventilate them properly in times of a general infection." *Lieber.* Generally, in these cases, it is for the judiciary, in the last

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

resort, to judge of the consistency of regulations made by the State or cities with the constitutional rights of the citizens. Trades and practices must be tolerated so far as properly used. They may be restrained at the point where they begin to be abused. Public policy encourages trade, and incites to inventions, leading to new pursuits, by rewarding the successful. Contracts in general restraint of trade are void at common law, as are contracts in full restraint of marriage, though partial and reasonable restraints in relation to both subjects are valid. *Beard et al.* v. *Dennis*, 6 Ind. R. 200. A contract not to marry a particular person is good; but a contract not to marry at all is void. Chit. Contr. 671. "Marriage, no doubt, may be made the subject of regulation by qualified restrictions, under certain circumstances, but under no circumstances whatever ought a general and entire restriction of it to be countenanced and sanctioned by law." *Middleton* v. *Rice*, 6 Pa. L. Jour. 240, quoted on p. 399 (top paging) of Williams on Personal Property.

By-laws of cities, in restraint of trade, are, when unreasonable, void. Ang. and Ames. on Corp. p. 277. In the light of these considerations and established principles, we think the legislature had a right to prescribe the condition, or regulation, as enacted, that railroads shall fence, or pay for the stock they injure. We cannot say judicially that it is not a reasonable regulation, necessary to prevent their injuring others, without such others' fault.

4. The third section, so far as it inflicts a penalty for appealing and failing to reduce the judgment 20 per cent. is, in our opinion, unconstitutional and void.

A law may be constitutional in part and unconstitutional in part. This third section relates to the practice of the law in these cases. The trial and rendition of judgment are a part of the practice in a cause. The section is special. Laws are general or special. This is the first great division. Special laws are again divided into local, personal, particular, &c. See Smith's

Com. p. 419. A special act concerns "the particular interest or benefit of certain individuals, or of particular classes of men." See 1 Kent, 459. A law may be "partly public and partly private."

The principle of this act is entirely different from the principle of those general laws fixing the jurisdiction of the several courts. The jurisdiction of the court of the justice of the peace is limited by them in respect to amount. But within that limit it operates alike upon all. So as to that of the Common Pleas and of the Supreme Court. There may, however, be unconstitutional sections in those acts. As to this we are not now called upon to speak.

The section, then, under consideration, being special, and upon the practice of the law, is prohibited by that clause of section 22, article 4, of the constitution which provides that no such act shall be passed, "regulating the practice in courts of justice."

5. The first section of the act is also void so far as it gives, as to amount, unlimited jurisdiction to justices of the peace. In that particular it is special, and in conflict with that clause of the section of the constitution just cited which prohibits special laws, "regulating the jurisdiction and duties of justices of the peace and constables."

This point, however, does not affect the present case.

The judgment must be reversed.

DAVISON, J.—I concur in the above opinion.

STUART, J.—Without approving or dissenting from the general course of discussion pursued in the above opinion, I concur in the conclusion.

GOOKINS, J.—I cannot concur in the view taken of this case by a majority of the Court; and I will state fully the grounds of my dissent.

The question of legislative power, so largely discussed by Judge PERKINS, does not, in my opinion, arise in the case. No one, so far as I am advised, denies the power of the legislature, by a law properly framed, to regulate

*Nov. Term, 1856.*

THE MADISON AND INDIANAPOLIS RAILROAD CO. *v.* WHITENECK.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

the management of railroads in such manner as to protect, as far as may be, the persons, lives, and property of those liable to be injured by or upon them; and however entertaining a discussion upon the subject might be, I shall defer it until some occasion may arise which shall legitimately call it forth. Until then, I shall be content with the views expressed by me in *Bebee* v. *The State*, 6 Ind. R. p. 539, *et seq*.

There is, however, a question presented by this record which I deem important. It involves the true construction of certain prohibitions in the constitution on the subject of special legislation; and as the decision of this cause is put upon those prohibitions, the question is presented with such directness, that a discussion of it cannot be foregone. I shall, therefore, proceed to its examination with the care and caution which, I think, should ever characterize such discussions. The declaring of an act of the legislature void, involves a conflict between two departments of the government; and it should never be done lightly, nor in any case of doubt.

Properly to understand these prohibitions, it will be necessary to look at article 4, of the constitution, as a whole—which will be done, after first stating the ground upon which the decision proceeds.

The particular ground upon which a majority of the Court proceed, in declaring this law unconstitutional is, that it contains a special provision on the subject of practice. The provision supposed to have been violated is contained in art. 4, ss. 22 and 23, which are as follows:

SEC. 22. The General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say:

Regulating the jurisdiction and duties of justices of the peace and of constables;

For the punishment of crimes and misdemeanors;

Regulating the practice in courts of justice;

Providing for changing the venue in civil and criminal cases;

Granting divorces;

Changing the names of persons;

For laying out, opening, and working on highways, and for the election or appointment of supervisors;

Vacating roads, town plats, streets, alleys, and public squares;

Summoning and empanneling grand and petit juries, and providing for their compensation;

Regulating county and township business;

Regulating the election of county and township officers, and their compensation;

For the assessment and collection of taxes for State, county, township, or road purposes;

Providing for supporting common schools, and for the preservation of school funds;

In relation to fees or salaries;

In relation to interest on money;

Providing for opening and conducting elections of State, county, or township officers, and designating the places of voting;

Providing for the sale of real estate belonging to minors or other persons laboring under legal disabilities, by executors, administrators, guardians, or trustees.

SEC. 23. In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State.

The fourth article of the constitution is devoted to the legislative department of the government. It vests the legislative power in the General Assembly; declares the style of the laws; fixes the number and qualifications of the members of the two houses,—the sessions—quorum—journal—powers of the two houses; directs as to the origin and passage of bills—protest—publication of the laws, &c. These provisions, or those of similar character, are found in the constitutions of all the States. Besides them, there are certain sections prescribing the manner in which bills shall be framed and passed, requiring that every bill shall be read through by sections on its final passage; that the vote be taken by yeas and nays; that

*Margin note:* Nov. Term, 1856.

THE MADISON AND INDIANAPOLIS RAILROAD CO. v. WHITENECK.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD Co.
v.
WHITENECK.

each act shall embrace but one subject, and matters properly connected with it; and that acts shall not be revised or amended by mere reference to the title. Then follow the sections above quoted, containing prohibitions against special and local legislation in certain cases.

The inquiry now arises, is the act in question a special or local law, within the meaning of these prohibitions? This may not seem, at first view, of much practical importance; but if closely scrutinized, I think it will be found not only to involve the question of the validity of a very large portion of our laws, but the further question, whether any system of laws, adapted to the wants and exigences of the people of the State, is practicable under the present constitution.

I fully concur in the opinion of Judge PERKINS, *supra*, that contemporaneous history furnishes the best rule for interpreting the constitution; which is nothing more than a common law and common sense rule of long standing, that to find the meaning of a statute we are to look at the object sought to be attained, or the evil sought to be remedied.

What were the evils at which the convention was aiming in adopting the checks and prohibitions in question? Some of them are referred to in the opinion I delivered in *Beebe* v. *The State*, 6 Ind. R. pp. 553, 555. I shall not repeat them, although they would appropriately illustrate the subject now under consideration. I shall speak of the history of legislation with reference to the 22d and 23d sections only.

At the time of the adoption of the constitution, special legislation had become an enormous and a rapidly increasing evil. Until 1835, excepting at those sessions which enacted a code, a volume of from one to three hundred pages, was found sufficient to contain the laws of a session. That of 1834 contained four hundred pages, which was a pretty large increase over the volumes of previous years; and many of the acts were of a private and local nature, not noticed by courts without pleading. At the session of 1835, the legislature

determined to separate laws of this character from
those of general interest and operation; and provided
that annually thereafter four thousand copies of the
general acts should be printed and bound separately,
and of the local acts seven hundred and fifty. These
were denominated special acts, and were directed to be
printed without marginal notes. Laws 1835, p. 76, ss.
2, 5, 6. A volume of special acts was enacted and
published annually thereafter. The code of 1843 in
terms defines this volume. It directs that there shall
be printed in one volume the general laws, and in
another volume the special and private acts, joint reso-
lutions of a local or private nature, and the memorials
of the then present, and future sessions of the General
Assembly, to be denominated the special acts. R. S.
1843, p. 171, s. 72. This definition of special acts was
upon the statute book, when the Constitutional Con-
vention of 1851 was in session,—by which time this
volume of special laws had increased to about six hun-
dred pages. Some of these laws were of local opera-
tion,—some were private,—and all were special.

Besides these there were numerous enactments upon
general subjects, but operating locally,—some in a town-
ship,—some in a county,—some in several counties,—
and some in a judicial circuit.

The favorite topics of local and special legislation
were those enumerated in the 22d section. In some
counties, its fiscal concerns were managed by a board
of justices,—in others by three commissioners. In some,
a justice's jurisdiction extended throughout the county,
and in others it was confined to his township. In some
counties justices had exclusive jurisdiction of most mis-
demeanors, and in others they were subjects of indict-
ment in the Circuit Court. A person going from one
county to another was never sure that the laws which
governed his conduct or his rights were the same as
those he had left. Even the judges were unaware of
the laws they were to administer. A judge upon his
circuit having delivered his charge to the grand jury, de-

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

finining the various crimes and misdemeanors, was sometimes informed at its close, that he had mistaken the law; that there was a local statute in that county which deprived the grand jury of jurisdiction of many of the subjects embraced in his charge, and conferred it upon justices. Attorneys were equally at fault in going from one circuit to another, or from one county to another in the same circuit. Examples of these enactments will be found in the acts regulating the practice in the county of *Allen*,—Laws, 1844, p. 26; in the eleventh circuit,—Laws, 1846, p. 39; in the third circuit,—*id.* 45; in the thirteenth circuit,—Laws of 1847, p. 139; in the county of *Lagrange*,—Laws, 1848, p. 20.

These were the particular laws that the prohibition in the 22d section, article 4, "regulating the practice in courts of justice," was aimed at. It was well said by STUART, J., in *Maize* v. *The State*, that to remedy these evils,—to restore the State from being a coterie of small independencies, with a body of local laws, like so many counties palatine, to what she should be, a unity, governed throughout her borders, on all subjects of common interest, by the same laws, general and uniform in their operation,—the restrictions in sections 22 and 23, were embodied in the constitution. 4 Ind. R. 348. This in my judgment, was a sound and correct exposition of the constitution. The learned judge was sustained in that view of the subject by the well known fact, that this species of legislation had long been regarded as a serious evil; that the executive had often called the attention of the legislature to it, in his annual messages—notwithstanding which the evil continued to increase; that a remedy for it was a prominent object in calling a convention to revise the constitution; that it was fully discussed before the people in the canvass for delegates, and afterwards in the convention, and finally, in the address by which the framers of the constitution submitted it to the people for their approval, —in which, upon this subject, they speak as follows:

" The most important restriction imposed on the leg-

islative branch, is that which provides, that, in a variety of enumerated cases, (as the jurisdiction of justices of the peace, the mode of doing county and township business, the fees of county and township officers, road laws, common school laws, and so forth,) and in all other cases where a general law can be made applicable, no special law shall be passed. It is an estimate much within the truth, that more than two-thirds of all the laws enacted in this State, since her admission into the Union, have been of the character here forbidden. More than two-thirds of our legislation, therefore,—and the most confusing and most mischievous portion of it, —is cut off by this single provision. Independently of the intrinsic benefits of such a change, the saving thereby effected of expense, both as regards the time of the legislature and the cost of printing our laws, will be great."

To show the contrast between this view of the subject and that taken by a majority of the Court, I quote the reasoning of the learned judge who pronounced the opinion.

"The third section, so far as it inflicts a penalty, for appealing and failing to reduce the judgment 20 per cent. is, in our opinion, unconstitutional and void.

"A law may be constitutional in part and unconstitutional in part. This third section relates to the practice of the law in these cases. The trial and rendition of judgment are a part of the practice in a cause. The section is special. Laws are general or special. This is the first great division. Special laws are again divided into local, personal, particular, &c. See Smith's Com. p. 419. A special act concerns 'the particular interest or benefit of certain individuals, or of particular classes of men.' See 1 Kent, 459. A law may be 'partly public and partly private.'

"The principle of this act is entirely different from the principle of those general laws fixing the jurisdiction of the several courts. The jurisdiction of the court

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

of the justice of the peace is limited by them in respect to amount. But within that limit it operates alike upon all. So as to that of the Common Pleas and of the Supreme Court. There may, however, be unconstitutional sections in those acts. As to this we are not now called upon to speak.

"The section, then, under consideration, being special and upon the practice of the law, is prohibited by that clause of section 22, article 4 of the constitution which provides that no such act shall be passed, 'regulating the practice in courts of justice.'

"The first section of the act is also void so far as it gives, as to amount, unlimited jurisdiction to justices of the peace. In that particular it is special, and in conflict with that clause of the section of the constitution just cited which prohibits special laws 'regulating the jurisdiction and duties of justices of the peace and of constables.'"

This exposition, so far as it relates to the third section, makes this provision, which is supposed to be on the subject of practice, unconstitutional, either because of its particular position in the statute book, or because it applies to railroad companies only, and not to all other parties. Was this what our statesmen were about, when making a constitution for us? If so, no one of them, in debating the subject, (Debates Const. Conv. vol. 2, p. 1768, *et seq.*,) suggested any thing of the kind; and, if so, then statesmanship is a different thing from what I had supposed it to be. I can well enough understand why a system of legislation should require that laws should operate throughout the State alike; but why that system should regulate the details of practice, is, I confess, a phase in government-making quite new to me.

The first of these objections I should not regard as entitled to extended notice, had not the argument been frequently pressed upon the Court, as was done with much earnestness in the case of *Bebee* v. *The State, supra,*

and had not the Court seemed inclined to give it some consideration.

We have an act devoted to practice in courts of justice, another for the election, and prescribing the jurisdiction and duties of justices, and others devoted to other subjects; and it has been insisted, that to make the act general, every provision. on the subject must be incorporated in one act; and that, if interspersed through the various other acts of the code, they become invalid. For instance, we have an act defining felonies, and another defining misdemeanors, and fixing their penalties; while there are some felonies and many misdemeanors defined and their penalties prescribed in other acts. The 19th section of article 4 is also relied upon, to show such provisions invalid. It is as follows:

"Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

I examined the question here presented, to some extent, in *Bebee* v. *The State*, 6 Ind. R. 551, 555. The history of our previous legislation was there referred to, to show the design of this constitutional provision. In confirmation of what was there said, it is proper to refer to the view which the convention took of this section, and its object, in their address. It is as follows:

"No law is to embrace more than one subject, and matters properly connected therewith; and the subject is to be expressed in the title. The tendency of this rule is to prevent what is familiarly termed 'log-rolling.' Two provisions having no proper connection with each other, may, under the present constitution, be embraced in the same bill, and be carried by a combination of their respective friends; though neither, in itself, have merit or strengh enough to obtain the vote

Nov. Term,
1856.

THE MADISON
AND INDIAN-
APOLIS RAIL-
ROAD CO.
v.
WHITENECK.

of a majority, and would fail, as it ought, if voted upon singly."

The other question is kindred to this, viz., the supposed unconstitutionality of a section on the subject of practice, which applies to railroad companies, and not to other parties. If this fact renders the provision void, I do not hesitate to say that no practice act can be framed adapted to our wants, that will be valid. The present code is replete with provisions equally special. Those in regard to the manner of conducting suits by and against infants, married women, poor persons, corporations, &c., by the same rule are void.

Let us refer to some provisions of the code, and, without stopping to distinguish which of the objections stated would invalidate them, see what havoc they will make of it. 1 R. S. p. 102, s. 10, regulates the practice on appeals from allowances by the county board; p 104, ss. 3, 4, the practice in case of the arrest of a privileged person; p. 111, s. 25, the practice before justices in assessing property for taxation; p. 113, s. 31, same, providing for a recovery to an unlimited amount before a justice, for failing to report merchandise subject to tax; p. 115, ss. 42, 43, the practice in recovering taxes against corporations; p. 135, ss. 128, 129, the practice against defaulting treasurers and their sureties; p. 138, s. 149, the practice before justice, and recovery to an unlimited amount, for failing to pay a bid at a sale for taxes; p. 149, ss. 9, 10, the practice in suits by Auditor of State; p. 157, s. 23, the practice in suits by banks; p. 158, s. 24, same, in suits against banks; p. 160, s. 36, defining a felony for false entries by officers and agents of banks; p. 164, s. 6, the practice on appeals, on requiring new official bonds; p. 200, s. 16, the practice in recovering penalties by and against bridge companies; p. 203, ss. 9, 10, the practice before justice, and unlimited recovery, for injuries to bridges; p. 230, ss. 34, 35, same, on appeals from county boards; pp. 241, 242, ss. 12, 13, 14, 16, 17, the practice in winding up defunct corpora-

tions; p. 243, ss. 3, 4, the practice by and against foreign corporations; pp. 279, 280, ss. 26, 27, 28, the practice before justice in recovering property adrift, without limit as to value; pp. 292, 293, ss. 3, 9, 10, the practice in cases of trespassing animals, with unlimited recovery before a justice; p. 305, s. 3, the practice in recovering wages; p. 321, s. 7, the practice against husband and wife; p. 336, s. 28, same, against insurance companies; p. 345, ss. 7, 8, same, in recovery of usurious interest; p. 362, ss. 8, 9, 10, 11, 12, sundry penalties and misdemeanors, and civil and criminal practice in prosecutions for them, in relation to marriages; p. 376, ss. 7, 9, misdemeanors for employing negroes and mulattoes, and for their coming into this State; p. 393, s. 3, penalty for unlicensed piloting; p. 399, s. 18, felony for embezzling by agent, &c., of plankroad company; p. 429, s. 9, penalty against recorder, and practice in recovering it, for improperly recording deed; p. 443, s. 27, against school trustee for neglect of duty; p. 448, s. 68, misdemeanor, by county officers in reference to school funds; p. 454, s. 124, the practice against school townships; p. 455, s. 134, against defaulting school commissioners; p. 470, s. 8, on appeal from surveys; p. 497, s. 20, in suits against civil townships. These are some, but not all, by far, of the instances in which unconstitutional enactments have been interspersed throughout our code, if it be unconstitutional to incorporate provisions on the subject of practice in other laws, or to discriminate in respect to parties. When enacted, several prominent members of the constitutional convention were members of the legislature, and gave them their sanction.

In many of the instances, where jurisdiction is conferred on inferior courts, the parties aggrieved have no remedies whatever, if these provisions are invalid. Was ever constitution so violated?

What has been already said, and the examples given, apply also to the supposed unconstitutionality of the first section,—which is thought to be void because it

does not limit the recovery to 100 dollars before a justice, and hence is special.

There is no constitutional provision limiting a justice's jurisdiction to any sum, but the justice's act so limits it. Its unconstitutionality is found, therefore, not by comparing it with the constitution, but by comparing it with another law. I object to this mode of proceeding, for the simple reason, that if one act conflicts with another, the last repeals the first; and it is observable that four, at least, of the acts to which I have referred, which give unlimited jurisdiction to justices in certain cases, besides the one under consideration, are of later date than that which limits their jurisdiction to 100 dollars; and according to the doctrine of *Spencer* v. *The State*, 5 Ind. R. 41, they repeal it *pro tanto*. I think that when the validity of an act is questioned, it should be compared with the constitution. If there is a conflict, it falls; otherwise, it stands.

Aside from the history of this constitutional prohibition, I am of the opinion that the language itself justifies the construction I have put upon it, and excludes any other. The twenty-third section shows the design of the twenty-second, and was evidently inserted to meet any omitted subject of special legislation. The words "throughout the State," explain what is meant by general laws, and utterly exclude the idea that reference was had to the details of practice.

I conclude, then—

1. That a law unlimited in its territorial operation except by the boundaries of the State, is a general law.

2. That the constitution requires only uniformity in the operation of the law, and not uniformity in the subjects on which it operates; and,

3. That it is immaterial in what connection a provision is found, provided it has an appropriate relation to the general subject of the act of which it forms a part.

I have discussed the subject at some length, to avoid the necessity of doing so again. Frequent reference is

made to those prohibitions, and a consideration of them has often been pressed upon the Court. The design of them, I think, was good, and if obeyed in their true spirit, I think they will have a salutary effect upon our legislation; but the interpretation given to them will, I think, render them not only useless, but will make any system of legislation under them, adapted to the wants of the people, absolutely impracticable.

Nov. Term, 1856.

THE MADISON AND INDIAN-APOLIS RAIL-ROAD CO. v. WHITENECK.

There is another question presented by this record, which seems to me well worthy of consideration. The act provides that if the defendant shall appeal, and shall not, in the appellate court, reduce the damages 20 per cent., the plaintiff shall recover double damages, and a docket fee of 5 dollars.

I do not doubt but that the legislature has power to charge a party with costs and damages where he has not shown substantial merits in his appeal,—as is the constant practice in appeals from justices' judgments, and in appeals to the Supreme Court. Nor do I doubt the power to discriminate in reference to particular classes of actions,—as in 2 R. S. pp. 126, 127, ss. 397, 398,—or, even in respect to railroads, between those fenced and those not fenced; nor the power to fix or limit the extent of a recovery in personal actions,—as in 2 R. S. p. 205, s. 784. But it is a grave question,—one that has not been discussed in the opinion delivered in this case,—whether this provision was not intended to exclude a party from a court of justice. The twelfth section of the bill of rights is as follows:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

It is difficult and perhaps impracticable, to mark the precise line which bounds the legislative power in a case of this kind. The statute which charges the plaintiff with costs, if he fail to recover 5 dollars, (2 R. S. p. 127, s. 398), is evidently designed to prevent suits being

brought in certain cases where the plaintiff has a right of action. It operates indirectly to produce that effect, and this does no more; for it does not absolutely forbid the defendant the right of appeal. The Supreme Court of the *United States*, in the cases of *Bronson* v. *Kinzie*, 1. How. 311, and *McCracken* v. *Hayward*, 2 *id.* 608, admitted the difficulty of so marking the line between rights and remedies as to declare at what point a statute ceased to be directory of the remedy, and began to impair the obligation of a contract; and they resorted to the expedient of comparing the statute with the contract, and by a general view of the subject, determining that the former affected the .latter in such a manner as to impair its obligation.

On such a view of the subject, authorities could scarcely be found to sustain any conclusion, and each case would furnish its own rule. Is the clause in this statute giving double damages, designed to discourage the bringing of unimportant suits, where justice is not the object really sought; or was it designed to keep parties out of court who have merits? I incline to believe the latter is its character; and, therefore, that it conflicts with the above quoted section of the bill of rights.

In some of the cases brought upon this law, now pending in this Court, recoveries were had in the first instance to the amount of several hundred dollars, and on appeal these damages were doubled. Admit that the defendant had not merits in the appeal sufficient to reduce the recovery 20 per cent,—still there might be grave questions whether the company was liable at all, which, if the defendant is to have, in the language of the constitution, "justice completely and without denial," it might be indispensable to have determined by a higher tribunal; and if the inflicting of double damages was designed to prevent the pursuit of a substantial remedy by due course of law, it would seem that the constitution was violated.

This is very different from the question of practice so fully discussed. Practice, in general, involves no princi-

ple; it merely directs the mode of asserting a right; but here an important principle is involved, intended, in this instance, to operate only upon certain corporations,—but which, if valid, may be extended to all other persons. On this ground, I am inclined to hold that the judgment of the Court of Common Pleas is wrong, and ought to be reversed.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*F. M. Finch* and *J. Slater*, for the appellant.

*W. M. Dunn* and *J. A. Hendricks*, for the appellee.