BOEHM, Justice,
dissenting.
For the reasons given below, I respectfully dissent. I believe the Court of Appeals correctly held that the inalienable right to liberty enshrined in Article I, Section 1 of the Indiana Bill of Rights includes the right of a woman to choose for herself whether to terminate her pregnancy, at least where there is no viable fetus or her health is at issue. I also believe the plaintiffs have alleged facts which, if they can be established, show that the statute in question imposes a material burden on the exercise of that right. Accordingly, I *995 agree with the Court of Appeals that the trial court's dismissal of the complaint in this case should be reversed and this case should be remanded for a trial on the merits of the plaintiffs' claims.
The Inalienable Rights to Life, Liberty, and the Pursuit of Happiness
There is no provision in the Indiana Constitution that adopts verbatim the prohibition found in the federal Fifth and Fourteenth Amendments against the government's depriving a person of "life, liberty, or property, without due process of law." That is, of course, the source of a woman's right to choose an abortion famously declared in Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 35 LEd.2d 147 (1973). This does not mean the Indiana Constitution imposes no restraints on legislative incursions into the lives of individual citizens. To the contrary, Article I, Section 1 of the Indiana Bill of Rights is a more straightforward declaration that "all people" have "certain inalienable rights" and that "among these are life, liberty, and the pursuit of happiness." As a textual matter, it is indisputable that this is a stronger affirmation of a right to individual liberty than can be found in the Federal Constitution.
Article I, Section 1 of the Indiana Constitution provides in its entirety:
Inherent and inalienable rights. WE DECLARE, that all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeagible right to alter and reform their government.
This language appeared in its current form for the first time in the 1851 Constitution, and for our purposes has remained unchanged since that time. It traces its lineage to the 1816 Constitution, which included a similar, but slightly different declaration of natural rights.[1] Both the 1816 Constitution and the 1851 Constitution affirmed the "liberty" right of all people.[2] ' Both clearly derived from and tracked the Declaration of Independence,[3] G and the source of this language-"the immortal Jefferson" [4]-was repeatedly ac *996 knowledged by the delegates to the 1851 Constitutional Convention. It was commonly understood that this language embodied the view that each individual possesses rights derived from natural law, whether grounded in religion[5] or a more secular philosophy.[6]
Judicial Enforcement of Article I, Section 1 Rights
On its face, the text of Section 1 declares "certain inalienable rights." This language appears, not in a preamble, but as Section 1 of Article I, significantly entitled "Bill of Rights." There can be no doubt other provisions of the Bill of Rights are enforceable by the courts.[7] The State does not dispute the principle of judicial review, but contends that Article I, Section 1 of the Indiana Constitution is essentially advisory, or directional, and has no content. I think the text of the Constitution, its history, and precedent all make clear that no vote of a legislative body and no executive action is permitted to deprive the people of those rights. As Justice Jackson eloquently put it:
The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.[8]
The debates surrounding the adoption of this provision reflect the same view. Delegate William Dunn, in the course of the debates on this section, declared that "the very object of a Constitution is to protect the minority in the enjoyment of their rights-to put a restraint upon the hot blood and the strong arm of the majority"[9] No one disputed that proposition. If the Constitution is to restrain the "hot blood" of the majority, it must identify some rights that the legislature cannot invade, and those rights must be enforceable by the courts, even in the face of legislation.
History also supports the view that these rights are intended to limit legislative discretion and are judicially enforceable. It is noteworthy that the liberty right was first declared in the original Indiana Constitution of 1816, more than a decade after the principle of judicial review of legislation for conformity to the Constitution was established in Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). The current Bill of Rights, including the liberty right, was adopted in 1851, almost a half century after that landmark decision and long after *997 the principle that Indiana courts must hold invalid a statute that violates the State Constitution was well established.[10] At the time the current Indiana Constitution was written, the notion that the courts are obliged to strike down legislation that violates a right guaranteed by the Indiana Bill of Rights was well entrenched in Indiana state constitutional jurisprudence.[11] There is no suggestion of dissatisfaction with that principle in the 1851 Convention. To the contrary, the fundamental assumption of the framers was that the ultimate source of legitimate governmental power remained in the people of the state. A written constitution created a limited government, and delegated to the legislature some, but by no means all powers of government. Indeed, shortly after the adoption of the 1851 Constitution, this Court, quoting Federalist No. 68: "[the courts of justice are to be considered the bulwarks of a limited constitution," held that the courts should declare void "a law in violation of the natural rights of man."[12]
Moreover, Section 1 is just that-the first section of the Indiana Constitution. And it is not accidentally so. Arguing for retention of the 1816 language that would expressly affirm "natural, inherent, and inalienable rights, among which are the enjoying and defending life and liberty and of acquiring, possessing, and protecting property," Mr. Dunn pleaded "let us give to this sentiment the first place in our bill of rights, that our children and our children's children may early learn it, and cherish it in their hearts as one of the fundamental principle of our government." [13] The version that was finally adopted omitted the express right "of acquiring, possessing, and protecting property," but only after the point was made that the rights would exist whether or not specifically listed in the written Constitution.[14] The courts agreed, finding such a right only five years later.[15]
Given this text, structure, and history of Article I, Section 1, it is not surprising that only four years after the adoption of the 1851 Constitution, two decisions of this Court invalidated legislation on the ground that it violated the Article I, Section 1 *998 right to "liberty." In Herman v. State, 8 Ind. 545, 1855 WL 3695 (1855) and Beebe v. State, 6 Ind. 501, 1855 WL 3616 (1855) this Court struck down statutes prohibiting manufacture or sale of whiskey, ale, porter, and beer. In so doing, this Court found that "the right of liberty and pursuing happiness secured by the constitution, embraces the right, in each compos mentis individual, of selecting what he will eat and drink." [16] Over a century later, principally because the due process clause of the Federal Constitution has been the principal source of definition of rights, there have been relatively few occasions for this Court to define or specify the rights guaranteed by Article I, Section 1, but no decision has suggested that there is no content to this provision. To the contrary, several cases have invalidated legislation as a violation of Section 1.[17] To the extent the courts have sustained legislation against a challenge that it restricts individual liberties in violation of Section 1, it has been on the ground that the law reflects a legitimate exercise of the "police power" of the state, and not on the ground that there is no justiciable issue or that the right to life, liberty, and the pursuit of happiness has no content.[18]
I conclude that Article I, Section 1 does indeed have substance and is designed to assure all persons in this state "certain inalienable rights" which are enforceable by the courts. As Chief Justice Shepard put it: "[T}here is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate." [19] The issue before this Court is therefore whether the liberty rights of a pregnant woman under the *999 Indiana Constitution include the right to choose an abortion. If there is such a right, the question becomes whether this legislation constitutes a valid state regulation or an unconstitutional alienation of that right.
The Right to Choose as Incident to the Right to Liberty
There can be no doubt that abortion was a crime in 1851. Presumably it is fair to assume that no delegate to the Convention believed that, by adopting Section 1, the framers were creating a right in pregnant women to choose to terminate their pregnancies. The State argues for a static view of the "inalienable" rights, "among which" are the three listed, and also that there is no "liberty" right to elect an abortion. I think the contention that the Hiberty rights guaranteed by Section 1 were frozen as of that date is not tenable. In 1851 we had slavery in many states and Article II, Section 5 of the 1851 Constitution denied the right to vote on the basis of race. Married women had no property rights until they were conferred by statute in 1923.[20] Both of these subjects were debated at length in the 1851 Constitution,[21] but both were left in a state that, by today's lights, is wholly incompatible with fundamental principles of ordered liberty. Both today, I submit, are governed by the "evolving" [22] protections affirmed by the Bill of Rights as well as by specific constitutional and statutory provisions.
It is no answer to say that amendments to the constitutions of the United States and of Indiana have since corrected the former, and statutory changes have dealt with the latter. Fortunately that is the case, and the courts have long since invalidated even the Indiana constitutional provisions as violative of the Federal Constitution. But these examples show that if there were no privileges and immunities clause in the Indiana Constitution, and no Fourteenth Amendment to impose federal due process and equal protection limitations on this state, we would now nonetheless readily conclude that the liberty right in Section 1 renders both of these legal anachronisms unconstitutional invasions of fundamental liberty rights. I therefore disagree that the legal status of abortion in 1851 establishes that there is no present Indiana constitutional liberty right to choose.
It is also noteworthy that the framers of our state Constitution were well aware that the "great principle that all men are created equal" had "not yet fulfilled its destiny, nor will it until universal liberty prevails throughout the earth."[23] This contemplated not only geographic spread of the seeds sown by the American Revolu *1000 tion. It also recognized that full blooming of liberty in the United States was yet to come, and that "the existence of slavery in our country is inconsistent with" [24] the declarations found in Section 1. Despite these then current severe shortcomings, the framers of our Constitution nevertheless adopted the view they attributed to the founders of the United States: in the fullness of time, the issue of slavery would resolve itself and the promise of the Declaration of Independence would be fulfilled. As one Delegate put it: "Our fathers felt this inconsistency, but they boldly proclaimed what they believed to be the true principle of government, trusting that in time slavery would cease to exist." [25] We find other recognition of the potential growth and fleshing out over time of the rights secured by Section 1. Many Delegates reminded the Convention from time to time that the views of the majority of citizens or legislators were transient and shifting, and that "government in this country is founded on the idea that it is created not for the benefit of the majority, but for the benefit of all." [26]
Delegates expressed the view that some rights were innate and immutable, whether or not they found textual expression in the Constitution.[27] Finally, the text of Section 1 itself-"among which are life, liberty, and the pursuit of happiness"-reflects an open-ended iteration of the rights conferred, not an exhaustive list. In sum, there was no common understanding among the framers that the text of the Constitution delimited or constituted an exhaustive listing of the rights conferred upon individual citizens by Section 1. There is no reason to suppose the people they represented who ultimately ratified the 1851 Constitution had any different view.
As Justice Dickson points out, my opinion for the majority in Sanchez v. State, 749 N.E.2d 509, 516 (Ind.2001), observed that "constitutional rights not grounded in a specific constitutional provision should not be readily discovered." However, as Sanchez also noted "fundamental fairness in judicial proceedings" is constitutionally required, despite the absence of any language directly addressing that issue, and despite the absence of a provision prohibiting the deprivation of liberty without due process of law. There are therefore some rights that are "assumed and required by our state constitution," even if found in no specific language. Id. at 515. That point is largely irrelevant here, because the liberty clause of Section 1 is a specific provision, albeit a vaguely worded one. It has been held to guarantee to each individual the freedom to contract, the freedom to decide what to eat and drink, and the freedom to engage in lawful businesses.[28] Though we have only a few square precedents under the Indiana Constitution as to the specifics embraced within the inalienable liberty right, we also have some more generalized expressions. In Matter of Lawrance, 579 N.E.2d 32, 39 (Ind.1991), Chief Justice Shepard attributed to the framers the belief that the liberty guaran *1001 teed by Section 1 "included the opportunity to manage one's own life, except in those areas yielded up to the body politic." We also have some commentary expressing the view that the rights to life, liberty, and the pursuit of happiness include some more specific rights that have been found to be protected by the Federal Constitution[29] and at least one that has specific guarantees in the Indiana Constitution." According to one history of our state Constitution, [30]the specific substantive content of [the Section 1 rights] involves a variety of liberties ranging from privacy to procreation, travel to holding office, entering into contract to practicing religion, and engaging in business practices to voting." [31]
The right to privacy, and the branch of that right that specifically identifies a right to reproductive choice, has been established in the Federal Constitution for several decades. Over sixty years ago, recognition that "[mJarriage and procreation are fundamental to the very existence and survival of the race" required strict serutiny of any statute that purported to establish a classification of individuals who might be sterilized.[32] Justice Harlan, in a 1961 dissent, articulated a right to privacy that ultimately was embraced by the majority in holding unconstitutional a state statute that prohibited use of contraceptives.[33] As it has evolved, I think the label "right to privacy" somewhat misleadingly describes this bundle of rights. The fundamental rights now recognized by the Federal Constitution include parent-child relationships,[34] and freedom of choice in marriage,[35] among others. Many of these rights are legs in the nature of rights to be out of the public eye than rights to be free to make one's own decisions on fundamentally protected areas, notably family relations and sex and reproduction. As such, I believe these rights are more properly described as a bundle of liberty rights than rights to privacy. Whatever their appellation, ultimately one such right was famously held to invalidate state legislation preventing abortion.[36]
These rights to marriage, parent-child relationships, and decisions as to procreation are nowhere to be found in the text of the Federal Constitution. Rather they derive ultimately from what Justice Brandeis *1002 presciently described as "the right to be let alone-the most comprehensive of rights and the right most valued by civilized men." [37] The Supreme Court of the United States, first in Griswold v. Connecticut and later in Roe v. Wade, cited the "penumbra" and "emanations" of the federal Bill of Rights and the Civil War Amendments as the source of these fundamental federal constitutional rights.[38] In interpreting the Indiana Constitution, however, we need not resort to inferences to find an express liberty right. As already explained, the Indiana Constitution, adopted six decades after the founding of the United States at a period of strong populist sentiment,[39] is more explicit in its affirmation of individual rights and its limitation of legislative power to intrude into personal affairs. As Professor Baude observed, given the history of this state, it follows that "the constitution's key values are not civility, equality, tranquility, or order, but liberty, opportunity, vigor, and privacy." [40] The framers of the Indiana Constitution were not yet graced with Justice Brandeig's felicitous formulation, but it seems that they would have readily embraced the "right to be let alone" as a fair summary of one incident of what they were getting at in assuring the rights to "life, liberty, and the pursuit of happiness." The "opportunity to manage one's own life," recognized in Matter of Lawrance sounds the same note. Finally, the right under the Indiana Constitution to privacy, albeit the branch protecting one from undue publicity and governmental snooping, has been long recognized, if not frequently litigated.[41]
The State argues that our deference to legislative judgment in other areas applies equally here. It is, of course, true that we have upheld a variety of statutes designed one way or another to regulate businesses, land use, and other activities. Specifically, the State analogizes the plaintiffs' claims here to an effort to resurrect the "now-discredited" notion of substantive due process. To be sure, both the federal and state constitutions were at one time cited as barriers to child labor laws, licensing requirements, etc., all in the name of a liberty right to conduct a business as one chooses. The poster child for this federal doctrine, Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 987 (1905), was overruled in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 392, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Some Indiana counterparts are cited in footnote 18. As we observed in McIntosh v. Melroe Co., 729 N.E.2d 972, 975 (Ind.2000), the Lochner doctrine is no longer credited. But even as it discarded Lochner, the U.S. Supreme Court was careful to note the potentially significant difference between constitutional constraints on economic regulatory measures and the limits the constitution places on laws affecting minority or individual rights. First in the list of those areas of suspect legislation identified in Chief Justice Stone's famous footnote was the scope *1003 of the Bill of Rights.[42] Ultimately, individual rights in family relationships and decisions as to procreation, among others, were recognized as fundamental in federal jurisprudence, and any legislation restrict ing them is subject to strict serutiny, usually resulting in its invalidation.[43]
The same considerations that gave rise to the federal recognition of substantive rights to privacy under the due process clause require recognition and enforcement of the more explicit liberty right under the Indiana Constitution. We are not talking here about licensing of some types of business, or restrictions on the use of property based on environmental concerns, both of which are grounded in the generally accepted need for government to provide for the common health and safety, and both, if individual liberty is carried to excess, involve infringing the liberties and perhaps the health and well being of others. In both federal and state jurisprudence, today the only debate is as to the degree or specific means of regulation that is appropriate, and whether it is "reasonably related" to some legitimate state interest.[44] Nor are we dealing with the situation presented in Melroe, which asserted a constitutional right to a particular remedy or right of action. The power of the legislature to create or abolish civil claims is well accepted, and there is no property or liberty right to any particular form of legal relief beyond what the legislature or the common law choose to make available.
Natural rights provided the philogophical grounding of "inalienable" rights as understood by the framers of both the federal and state constitutions. It does not matter whether today we accept the idea that every person has some rights conferred by a higher power, or consider these rights as inherent in nature, or see them established simply as a matter of choice. Irrespective of the source of these rights, the Indiana Constitution insulates some areas of human activity and guarantees that they are free from interference by the legislature. To the extent it is a matter of choice, the constitution makes that choice for us. The issue, of course, is how to identify the areas of human activity that are within the sphere of the inalienable rights guaranteed by Section 1.
One critical difference between the liberty and property rights historically asserted under the rubric of substantive due process and the liberty rights often associated with a right to privacy is the vast difference in the degree of societal interest in the consequences of one's choices to others. Violations of land use regulations, or *1004 environmental controls, or the antitrust laws, or the child labor laws, have direct and sometimes dire effects on the property, health, or well-being of other citizens. The consequences of individual decisions of whom to marry, whether to have a child, and whether to carry a nonviable fetus to term are exclusively, or at least overwhelmingly, personal. To be sure, the sensibilities of some may be offended by the choices of others in selecting a spouse, or a married couple's decision to use or forego contraceptives. But that result is largely due to the varied attitudes towards these matters that are grounded in individual philosophies and religions. Government has no role in seeking to take sides in those debates over matters of conscience. Indeed the constitution is explicit on this point: "No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience." Ind. Const., Art. 1 § 3.
A second perhaps more important difference lies in the nature of the value judgments reflected in the decision, say, to operate a landfill and the decision to bear a child. To be sure, in the view of many, the decision whether to complete a pregnancy involves society's interest in promoting human life, and many others consider the fetus as entitled to the same rights and considerations as any human already. Some have suggested that the attending physicians, other family members, and perhaps others are also entitled to weight in the constitutional balance.[45] But the decision is nevertheless an intensely personal one. The factors that may bear on that decision undoubtedly vary widely from individual to individual. Some will place a high priority on the mental or physical health of the woman herself. Others will assign the greatest significance to the anticipated health of the child. Yet others will give greatest weight to the social or economic consequences of giving birth. And, of course, many consider the intrinsic value they place on a potential, or, as some view it, already realized human life as the dominant consideration. Each of these judgments turns on the degree, if any, to which one considers each of these and other factors to be legitimate and relevant. And every individual's answer to those issues turns pivotally on the philosophical and religious outlook of the individual. The question whether to terminate a pregnancy, indeed each individual's way of approaching and thinking about that decision, therefore ultimately becomes one of personal outlook. As the Montana Supreme Court recently put it:
The fundamental right to personal and procreative autonomy and, in the broader sense, to individual privacy, prohibits the government from dictating, approving or condemning values, beliefs and matters ultimately involving individual conscience, where opinions about the nature of such values and beliefs are seriously divided; where, at their core, such values and beliefs reflect essentially religious convictions that are fundamental to moral personality; and where the government's decision has a greatly disparate impact on the persons whose individual beliefs and personal commitments are displaced by the State's legislated values."[46]
Of course I do not suggest that because there may be religious underpinnings of moral values reflected in legislation, the liberty right immunizes each individual from society's judgment as to the lawfulness of any given practice. Specifically, *1005 contrary to Justice Dickson's suggestion, I think it clear that liberty rights do not include the right to murder, steal, or perjure oneself. There may be religious grounds to oppose these actions, but they are also condemned by virtually all philosophies and criminalizing them reflects a nearly unanimous consensus that does not depend on one's individual outlook.
In sum, this Court has found "core values" enshrined in the Indiana Constitution that cannot be alienated by a "material burden." As Justice Dickson pointed out in City Chapel, Indiana of 1850 was home to followers of a wide array of religious beliefs and also to many who adhered to no faith.[47] I believe one of these core values is the right to be free from legislation that restricts individual liberty based on essentially philosophical or religious views as to which there is no general consensus. In addition to the explicit prohibition against a law that "interferes with ... rights of conscience," that value is expressed repeatedly throughout the debates, though not in precisely that language. Most commonly it appears as a desire to protect rights of minorities and concern for the potential tyranny of the majority.[48] It also appears in the strongly expressed respect for the diversity of opinion on matters of conscience that prevailed in 1851 and remains today. For that reason, I believe this liberty right is entitled to the greatest deference as an exercise of personal liberty, and conclude that the liberty right guaranteed by the Indiana Constitution includes the right of a pregnant woman to terminate her pregnancy, at least where she carries a nonviable fetus or her own health is at issue.
Federal "Obstacles" and Indiana © "Burdens" on Liberty Rights
The majority assumes an Indiana constitutional right to choose an abortion, but finds that the statute imposes no material burden on this right. I do not share either the majority's view of the material burden doctrine or its deseription of federal jurisprudence. I therefore do not find federal precedent, specifically Planned Parent: *1006 hood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), to be helpful in resolving the issue under the Indiana Constitution.
Under Indiana constitutional doctrine, these "core values" cannot be subjected to "material burdens." [49] The "material burden" standard is different from, and more stringent than the federal constitutional test. In Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 LEd.2d 743 (2000), a majority of the Supreme Court embraced the standard first articulated in Justice O'Connor's plurality opinion in Casey. The federal standard requires a showing that the state law "has the purpose or effect of placing a substantial obstacle in the path" of a person's exercise of a liberty right.[50] Casey involved a Pennsylvania statute very similar to the Indiana statute the plaintiffs challenge. The Supreme Court upheld the Pennsylvania law against a federal constitutional challenge, holding that the test is whether the statute imposed an "undue burden on a woman's ability to make this decision," but explaining that this was "shorthand" for the "substantial obstacle" formulation.[51] Under this formulation, a statute is unconstitutional if either its purpose or its effect is to place such an obstacle. It is not clear whether a purpose without effect is sufficient to render a statute unconstitutional.[52] As a practical matter, legislative motivation, however it is to be ascertained, is obscure and often in the eye of the beholder. Because some proper legislative goal is usually available, the battleground, as in this case, is usually the "effect" branch of this "undue burden" test. And if the statute's purpose is a legitimate one, Casey teaches that the statute must use "reasonable measures." [53] As one commentator put it, the net result of this is that the federal test "turns ultimately not on a factual determination of whether the state has affected the exercise of private choice, but on a normative assessment of whether the state's imposition on private choice is reasonable." [54]
The Indiana standard is "material burden," not "substantial obstacle," with its ultimate dependence on reasonableness. The difference is significant. As Price explained, in distinguishing the similar "rational relationship" weighing process under federal equal protection jurisprudence: "'Material burden' analysis involves no such weighing nor is it influenced by the social utility of the state action at issue. Instead, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired." [55] Because federal juris *1007 prudence is less vigorous in its defense of individual liberty rights, Casey is not persuasive authority under the Indiana Constitution.
The Claims of "Material Burden" on Liberty Rights
This case comes to us on appeal from the grant of a motion to dismiss the complaint for failure to state a claim for relief by the courts. Accordingly, we assume the allegations of the complaint are true. If the allegations, even if true, are not enough to state a claim for relief, then the trial court properly dismissed this action. However, if the allegations are sufficient to state a claim, whether the plaintiffs will be able to prove them or not is not before us today and remains a matter for trial.
As explained above, Indiana adopts precisely the mode of viewing these rights that Casey rejected-the Indiana Constitution permits a statute to impair a Section 1 right only if there is no material burden. This is no balancing test. Price initially explained material burden as one that significantly affects the exercise of the right. Whittington v. State, 669 NE.2d 1363 (Ind.1996), further explained that a material burden will be found if the expression of the right inflicts "'particularized harm' analogous to tortious injury on readily identifiable private interests." [56]
The Indiana cases that Justice Dickson cites balancing liberty rights against "police power" are remnants of the post-Lo-chner era where freedom of contract and property disposition were held subject to police power. We have not held that individual core values are subject to any such balancing. To the contrary, as Price teaches, a material burden on a core value is unconstitutional irrespective of its legislative purpose. Indeed, Price itself involved a government action-maintenance of order in the streets-at the center of public safety concerns. Yet public safety concerns were not permitted to override individual liberty if the results placed a material burden on political speech. The constitution's reference to government's deriving its authority from the people does not suggest a balancing test where core values are concerned. It simply reflects a recognition that governments are essential and that the people who ratify the constitution are the ultimate source of power, including the provisions of the constitution that limit the authority of the legislative, executive, and judicial branches. The legislature is not the people. It is a branch of the government created by the people and subject to the limitations imposed by the constitution.
The complaint here alleges, among other things, that this statute requires delay in medical procedures and that health risks and the cost of the procedure both increase as time goes on. It also alleges that the effect of this statute is to cause some women to travel to other states, or to pursue alternatives other than legal abortion, which can cause physical and psychological harm as well as economic loss. Forcing someone to incur a substantial financial burden or forego altogether exercise of the person's right to choose is surely a material burden. If these allegations can be proven, they are sufficient to state a claim that the statute imposes a material burden on the exercise of a woman's liberty right to determine for herself whether to abort a nonviable fetus. The additional requirement that the expression of the right not inflict injury in the nature of a tort is also met. Some would attribute to the fetus a status as an independent individual that would permit characterizing an abortion as a wrong to the fetus. But *1008 that assumption is not generally shared. Many disagree, and the views of all are rooted in their individual "matters of conscience." Resolution of that debate is left to each individual by the liberty right ree-ognized by the Indiana Constitution. Accordingly, I agree with the Court of Appeals that the judgment of the trial court dismissing this action should be reversed.
Finally, I do not agree with the majority's view that this complaint asserts a facial challenge that requires a showing that there are no factual settings in which the statute may be constitutional. The only instance in which that doctrine has been addressed in Indiana constitutional jurisprudence is Baldwin v. Reagan, 715 N.E.2d 332 (Ind.1999). That case dealt with the constitutionality of the seat belt requirement. It addressed whether there may be modes of enforcing a statute that are consistent with the constitution. It did not deal with a claim that the statute invaded any core value. It does not, in my view, justify an unconstitutional impact or a material burden on the core rights of some individuals simply because not everyone is affected.
Baldwin relied on federal constitutional authority. 715 N.E.2d at 337 (citing Reno v. Flores, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 LEd2d 1 (1993); United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 LEd.2d 697 (1987)). As pointed out, the federal constitutional doctrine regarding "overbreadth" has been limited to First Amendment rights. The basic notion is that a statute that may be a valid restriction on speech in some cireum-stances nonetheless has a chilling effect on the rights of expression on others. Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 576, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Moreover, a statute that is broad in its terms but narrowed only by the choice to enforce it opens the door to abuse. Id. The same reasoning applies here. We cannot know who among potential candidates will be significantly deterred by this statute from exercising her rights, but if it is found to impose a material burden as to a significant number of individuals its chilling effect is equally pernicious as an over-broad restriction on speech. There may be issues of standing that preclude some plaintiffs from asserting claims that in effect assert invasions of the rights of others. See, e.g., H.L. v. Matheson, 450 U.S. 398, 407, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). But the plaintiffs here are providers, not individuals seeking a declaration as to their status. The providers serve the entire range of potential individual claimants, and as such are not subject to an "overbreadth" deficiency. There may be a de minimis threshold as to which only an individually affected plaintiff can assert a claim.. But where, as here, the plaintiffs contend that "many" of the people they seek to serve are affected, they are in my view entitled to a day in court to prove that claim. Otherwise stated, the providers' claim is not "facial." It attacks the statute as they contend it affects them by deterring others from availing themselves of their services.

. Article I, Section 1 of the 1816 Indiana Constitution provided:
That the general, great and essential principles of liberty and free Government may be recognized and unalterably established; WE declare, That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights; among which are the enjoying and defending life and liberty, and of acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety.

. The 1816 and 1851 versions of Section 1 referred to the rights of all "men." In 1984 this language was changed to all "people," but it is clear from the debates that the vast majority of delegates understood that the term was used "in its general sense" and included women. 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 958 (AH. Brown ed., 1850) [hereinafter Debates] (Statement of Robert Dale Owen (Dem.Po-sey)). See also id. at 958 (Statement of John Pettit (Dem.Tippecanoe): "man'" as used in Section 1 is "a generic term, embracing the whole human race").

. Alexander Stevenson (Whig Putnam), proposing substituting this language, which was ultimately adopted, for the initial proposal by Johnson Watts (Whig Dearborn), described it as "an exact copy of part of the Declaration of Independence." 1 Debates, supra note 2, at 957.

. 1 Debates, supra note 2, at 958 (Statement of Robert Dale Owen (Dem.Posey)).

. See Michael John DeBoer, Equality as a Fundamental Value in the Indiana Constitution, 38 Val. U.L.Rev. 489, 522 (2004).

. For a review of the roots of natural rights as understood in the eighteenth and early nineteenth centuries from the writings of John Locke, John Stuart Mill and others see Armstrong v. State, 296 Mont. 361, 989 P.2d 364, 372-73 (1999).

. The layout of the Indiana Constitution is, first, a preamble, followed by Article I, entitled "Bill of Rights" and enumerating rights of religious freedom, freedom of speech, rights to jury trial, freedom from unreasonable searches and seizures, and several others among the bedrock of American liberties that cannot be infringed by either legislative or executive action. See generally Price v. State, 622 N.E.2d 954 (Ind.1993).

. W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

. 1 Debates, supra note 2, at 956 (Statement of William Dunn (Whig Jefferson)).

. Elwell v. Tucker, 1 Blackf. 285, 286, 1823 WL 1039 (Ind.1823) ("If that act is Constitutional, the judgment must stand; if otherwise, it must be reversed."); Clark v. Ellis, 2 Blackf. 8, 10, 1826 WL 1078 (Ind.1826) ("We have heretofore decided that a part of an act of assembly being unconstitutional, does not affect a constitutional part of the same act relative to the same subject. That part which is unconstitutional, is considered as if stricken out of the act; and if enough remains to be intelligibly acted upon, it is considered as the law of the land.").

. See, e.g., State v. Mead, 4 Blackf. 309, 1837 WL 1834 (Ind.1837) (statute authorizing bench trials violates state constitutional right to jury trial); Rubottom v. M'Clure, 4 BlackL. 505, 1838 WL 1888 (Ind.1838) (statute authorizing commissioners to take land for the Wabash and Erie Canal does not violate the constitutional prohibition against taking property without compensation because of the provision in the statute for compensating the owners).

. Madison & Indianapolis R.R. Co. v. Whiteneck, 8 Ind. 217, 229-30, 1856 WL 3671 (1856).

. 1 Debates, supra note 2, at 957.

. Id. at 958 (Statement of Robert Dale Owen (Dem.Posey)). Mr. Owen's point was that other state constitutions also omitted specific reference to the right to acquire property, but that. as citizens of the United States, and therefore possessors of the "inalienable rights" expressed in the Declaration of Independence, that right existed whether or not it was listed in the constitution of a state. See also id. (Statement of John B. Howe (Whig Lagrange): "I am not particular whether the section in the original Constitution is retained or not").

. Whiteneck, 8 Ind. at 230.

. Herman, 8 Ind. at 558.

. See Dep't of Fin'l Insts. v. Holt, 231 Ind. 293, 309, 108 N.E.2d 629, 637 (1952) (invalidating a statute limiting the amount that purchasers of retail installment contracts could agree to pay retail dealers because it was an impermissible exercise of the State's police power under Article I, Section 1); Kirtley v. State, 227 Ind. 175, 179-80, 84 N.E.2d 712, 714 (1949) (statute prohibiting "scalping" of tickets to sports events violates Article 1, Section 1 liberty right which includes freedom of contract); Dep't of Ins. v. Schoonover, 225 Ind. 187, 192-94, 72 NE.2d 747, 749-50 (1947) (Regulation requiring commissions to be paid on insurance sales impairs liberty right to do business under Article I, Section 1 and is not justified by police power. "The rights guaranteed by Art. 1, § 1, are cherished rights and not to be surrendered lightly."); State Bd. of Barber Exam'rs v. Cloud, 220 Ind. 552, 572-73, 44 N.E.2d 972, 980 (1942) ('The individual's right to engage in a lawful business, to determine the price of his labor and to fix the hours when his place of business shall be kept open, except as they conflict with the police power, are personal privileges and liberties within the protection of [Article I, Sections 1 and 23 of] the Indiana Bill of Rights."); Street v. Varney Elec. Supply Co., 160 Ind. 338, 342, 66 N.E. 895, 896-97 (1903) (invalidating minimum wage legislation for public works projects).

. See, e.g., State ex rel. Ind. Real Estate Comm'n v. Meier, 244 Ind. 12, 19-20, 190 N.E.2d 191, 195 (1963) (licensing requirement for real estate agents is legitimate exercise of police power); Ice v. State, 240 Ind. 82, 86, 161 N.E.2d 171, 173 (1959) (law limiting dentistry practice to licensed dentists is not unconstitutional); Alanel Corp. v. Indianapolis Redevelopment Comm'n, 239 Ind. 35, 52, 154 N.E.2d 515, 524 (1958) (law allowing redevelopment commission to acquire a fee title to property does not violate Article I, Section 1). Sometimes the police power was taken to extremes not likely to be upheld today. See, e.g., Thomas v. City of Indianapolis, 195 Ind. 440, 452, 145 N.E. 550, 554 (1924) (city ordinance prohibfiing picketing is a valid exercise of police power).

. Price, 622 N.E.2d at 960. See also City Chapel Evangelical Free Inc. v. City of South Bend, 744 N.E.2d 443, 450 (Ind.2001) ("As we held in Price, the police power of the State is limited and may not materially burden one of the core values embodied within each provision of the Bill of Rights of Indiana's Constitution.").

. See 1923 Ind. Acts, ch. 63, § 3, pp. 190-91.

. See 1 Debates, supra note 2, at 228-242 (rejecting proposal to put the issue to the people and ultimately adopting Article II, Section 5 of the 1851 Constitution, which denied suffrage to "negroes"); 1 Debates, supra note 2, at 561-642 (on proposal to require legislation preventing "negroes" from entering the state or owning property in the state; ultimately Article XIII was adopted providing "no negro or mulatto shall come into or settle in the State, after the adoption of this Constitution"); 2 Debates, supra note 2, at 1183-95, 2012-13 (rejecting proposed right of married women to own separate property).

. The term is Chief Justice Shepard's describing the Section 9 right to political speech: "In Price we reviewed the history of constitutional development in Indiana and concluded that implicit in the evolving protection for expression under the Indiana Bill of Rights is the idea that political expression is generally consistent with the goals of the police power." Whittington v. State, 669 N.E.2d 1363, 1369 (Ind.1996).

. 1 Debates, supra note 2, at 957 (Statement of William M. Dunn (Whig Jefferson).

. Id.

. Id.

. 1 Debates, supra note 2, at 960 (Statement of John B. Howe (Whig Lagrange)) (emphasis in original).

. "I hold this to be the true American doctrine, on this subject, that all men, without regard to birth or color, have an inherent right to acquire and enjoy the possession of property, independent of any Constitutional sanction whatever." 1 Debates, supra note 2, at 593 (Statement of Milton Gregg (Whig Jefferson)).

. See cases cited in footnote 17.

. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 LEd.2d 674 (1992) (laws and traditions afford constitutional protection to personal decisions relating to procreation, contraception, child rearing, and education); Griswold v. Conn., 381 U.S. 479, 497, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (the Federal Constitution protects the right to marital privacy); Passenger Cases, 7 How. 283, 492, 12 L.Ed. 702 (U.S.1849) (recognizing that the nature of the Federal Union and the constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the United States uninhabited by statutes, rules, or regulations which unreasonably burden or restrict this movement).

. Article I, Section 3 guarantees the right of "free exercise and enjoyment of religious opinions."

. William P. McLauchlan, The Indiana State Constitution 33 (G. Alan Tarr ed., Greenwood Press 1996).

. Skinner v. Okla., 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

. See Griswold, 381 U.S. at 497, 85 S.Ct. 1678; Poe v. Ullman, 367 U.S. 497, 522, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

. Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

. Boddie v. Conn., 401 U.S. 371, 374, 91 S.Ct. 780, 28 LEd.2d 113 (1971); Loving v. Va., 388 U.S. 1, 12, 87 S.Ct. 1817, 18 LEd.2d 1010 (1967).

. Roe, 410 U.S. at 154, 93 S.Ct. 705.

. Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

. Griswold, 381 U.S. at 484-85, 85 S.Ct. 1678; Roe, 410 U.S. at 129, 93 S.Ct. 705.

. See generally Donald F. Carmony, Indiana 1816-1850: The Pioneer Period 403-451 (1998) (Chapter 8: "The Jacksonian Constitution of 1851"). .

. Patrick Baude, Has the Indiana Constitution Found its Epic?, 69 Ind. LJ. 849, 854 (1994).

. See Voelker v. Tyndall, 226 Ind. 43, 44-45, 75 N.E.2d 548, 549 (1947) (the right of privacy "is a well established doctrine, derived from natural law and guaranteed by both the Federal and State Constitutions").

. 'There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments, which are deemed equally specific when held to be embraced within the Fourteenth." United States v. Carolene Prod. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (Justice Harlan F. Stone was an Associate Justice at the time this footnote was. written. He became Chief Justice in 1941).

. See generally 3 Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3 (3d ed.1999).

. See, e.g., Kamerling v. O'Hagan, 512 F.2d 443, 445 (2d Cir.1975) (firefighter grooming regulation); Miller v. Ackerman, 488 F.2d 920, 922 (8th Cir.1973) (grooming standards of Marine Corps); Greenlee v. Bd. of Med., 813 F.Supp. 48, 58 (D.C.1993) (medical licensing board's actions were not irrational and they were reasonably related to a legitimate state interest); Dep't of Nat'l Res. v. Ind. Coal Council, Inc., 542 N.E.2d 1000, 1005 (Ind.1989) (must be a "substantial relation" between land use regulation and legitimate state interest); Meier, 244 Ind. at 20, 190 N.E.2d at 195 (act requiring a real estate broker to procure a license upheld).

. See, e.g., Casey, 505 U.S. at 852-53, 112 S.Ct. 2791 (O'Connor, J., plurality).

. Armstrong v. State, 296 Mont. 361, 989 P.2d 364, 382 (1999).

. By 1850, Indiana included a variety of religious communities, including Methodist, Baptist, Presbyterian, Roman Catholic, Quaker, Lutheran, Jewish, United Brethren, and Disciples of Christ. See generally James H. Madison, The Indiana Way 98-104 (1986). Professor Madison also observes that many Indiana residents at the time were unaffiliated with any religious congregation, and notes that two of the delegates to the Indiana Constitutional Convention, Robert Dale Owen and. John Pettit, were considered "freethinkers." Id. at 99. The framers' and ratifiers' respect for the variety of religious opinions and practices is underscored by their inclusion in the Bill of Rights of Section 7 ("No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion.") and Section 8 ('The mode of administering an oath or affirmation shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered.").
City Chapel, 744 N.E.2d at 449. Alexander F. Morrison (Dem.Marion), declared himself "no churchman of any sect," 1 Debates, supra note 2, at 853, in successfully opposing a preamble amendment that would read:
We, the people of the Commonwealth of Indiana, acknowledge the gracious Providence of God in bestowing upon us the great and manifold blessings of a Christian civilization, and in particular in vouchsafing to us a condition of society in which the rights, social, political, and religious, conferred by Him on mankind, are recognized and respected; for the protection of these rights, and the establishment of justice, liberty, and the general well-being, do solemnly ordain and establish this.
Id. at 852.

. See, e.g., 1 Debates, supra note 2, at 956 (Statement of William Dunn (Whig Jefferson)). -

. Price, 622 N.E.2d at 961.

. See Stenberg v. Carhart, 530 U.S. 914, 918, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (majority opinion of Justice Breyer, quoting from the plurality opinion of Justice O'Connor in Casey ).

. Casey, 505 U.S. at 874, 112 S.Ct. 2791.

. See Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 LEd.2d 162 (1997) (Per curiam for six Justices: "even if we assume" a purpose without effect is sufficient, but finding no effect). Cf. Stenberg, 530 U.S. at 1008 n. 19, 120 S.Ct. 2597 (Justice Thomas, dissenting and attributing to Justice Ginsberg the view that purpose alone is sufficient, but contending that view is inconsistent with Mazurek ).

. Casey, 505 U.S. at 877, 112 S.Ct. 2791.

. David D. Meyer, Lochner Redeemed: Family Privacy After Troxel and Carhart, 48 UCLA L.Rev. 1125, 1169 (2001).

. 622 N.E.2d at 961 n. 7. See also City Chapel, 744 N.E.2d at 447 ("'The 'material burden' analysis looks only to the magnitude of the impairment.").

. Whittington, 669 N.E.2d at 1370.